Lizzie HOBSON, Mother and Next Friend of Deborah Lynn Cleaves, Plaintiff,

v.

Edgar H. BAILEY, Hugh H. Bosworth, Frances M. Coe, Jane Seessel, and John T. Shea, Members of the Board of Education of the Memphis City Schools, E. C. Stimbert, Superintendent of the Memphis City Schools, Quinnie McCormick, Jr., Coordinator of the Department of Pupil Services of the Memphis City Schools, and John B. Michael, Principal of Northside High School, Defendants.

Civ. No. 70–25.

United States District Court,
W. D. Tennessee, W. D.

Feb. 20, 1970.

Ronald S. Borod, W. J. Michael Cody, Memphis, Tenn., for plaintiff.

Ernest G. Kelly, Jr., Evans, Petree, Cobb & Edwards, Memphis, Tenn., for defendants.

## OPINION

ROBERT M. McRAE, Jr., District Judge.

The Court has conducted an evidentiary hearing on the application for a preliminary injunction seeking to enjoin the defendants from refusing to allow Deborah Lynn Cleaves to return to Northside High School, the school in the Memphis, Tennessee system in the geographic zone in which she lives, and from which she was suspended in November, 1969.

Plaintiff is the mother of Deborah Lynn Cleaves, age 17, who, in September, 1969, began her senior year at Northside High School. Miss Cleaves was enrolled in the federally funded Vocational Office Education (VOE) program. She was president of the VOE Club at Northside, was a senior class officer, and was inducted into the National Honor Society her junior year on the basis of her academic record which consisted of A's and B'. Prior to November, 1969, she had no record of disciplinary action against her. She was highly regarded by her principal, and she had shown exceptional industry and promise as a volunteer worker in summer educational programs for younger children.

Defendants, Edgar H. Bailey, Hugh H. Bosworth, Frances M. Coe, Jane Seessel, and John T. Shea, are the elected members of the Board of Education of the Memphis City Schools. Defendant, E. C. Stimbert, is Superintendent of the Memphis City Schools. Defendant, Quinnie McCormick, Jr., is Coordinator of the Department of Pupil Services of the Memphis City Schools. Defendant

John B. Michael is Principal of Northside High School.

In October, 1969, segments of the black community in Memphis sought support for a municipal employees' union in its efforts to win recognition from a private hospital in the City as bargaining representative for certain of its non-supervisory employees, most of whom were black. Also support was sought by the Memphis Branch of the National Association for the Advancement of Colored People, (NAACP), in its efforts to obtain redress of grievances from the Memphis School system, including but not limited to the lack of Negro representation on the Board of Education. To rally support for these two efforts, demonstrations, boycotts and other protest activities were organized. Among these was a call for a series of "Black Mondays" on which parents of black students were urged to keep their children home from school. The Mondays falling on October 13, October 20, October 27, November 3, November 10, and November 17, 1969, were so designated, and student absences 'in black schools on those days were sizeable.

During the period of the boycott, the school system experienced a crisis. Absenteeism in the schools on certain days exceeded sixty-five thousand (65,000) pupils. In addition to the students who were absent because they supported the boycott, there were students who preferred to attend school but were under coercion not to attend. There were some instances of rock and bottle throwing, damage to school property, and instances wherein the disruption and disturbances required the closing of a school for all pupils on certain days.

Miss Cleaves did not participate in the boycott on Monday, October 13, 1969. However, prior to the October 20 Monday boycott, she was persuaded that she should become a participant in further school boycotts. With her mother's permission she did not attend school on the Mondays of October 20, 27, November 3 and 10, 1969.

On Tuesday, November 11, 1969, Miss Cleaves reported to school but, together with most of the student body, left in a walkout before classes convened. On Wednesday, November 12, 1969, her principal, the defendant Michael, placed her on "Home Suspension" and caused to be given her a written form which stated that she must return to school within three days accompanied by a parent, in order to be reinstated. The grounds for the home suspension were "cutting class—leaving school without permission." (T.E.2)

The plaintiff, the head of a household of ten children and one grandchild, determined that she could ill afford to lose a day's pay by accompanying her daughter to school on Thursday, November 13, 1969, and, therefore, determined to accompany her daughter, Deborah, to school on Friday, November 14, 1969, within the three-day period allowed by the Home Suspension form. On November 13, 1969, while on the three-day suspension, Miss Cleaves walked with her brother to Northside School. She did not enter upon the school grounds but did join a picket line on the sidewalk in front of the school. She did not carry a sign but she did have in her possession a newspaper which contained headlines that persons had been gassed in a march. Whether she displayed it in an effort of persuasion, is not clear in the proof. The defendant Michael observed Miss Cleaves in the picket line from the window of his office but did not observe her commit any overt act or other form of persuasion of other students to refrain from attending school. He did observe that some students, upon approaching the picket line, did not come to school and, presumably, returned to their homes. Other students ignored the line and came to school. There is no proof that any physical contact or disorder was created by the members of the picket line.

On Friday, November 14, 1969, plaintiff accompanied her daughter to Northside School in accordance with the terms

of the home suspension and learned that the defendant Michael, on the prior day, had placed Miss Cleaves on "Board Suspension" for "picketing in front of the school and inciting students not to enter the building." (T.E.3) The board suspension notice directs the parent of the suspended student to contact the "Assistant Superintendent of Pupil Services" for the Board of Education of the Memphis City Schools. The plaintiff and her daughter left Northside School and went immediately to the Board of Education where they were shown to the office of the defendant Quinnie McCormick, Jr. The defendant McCormick had been forwarded a carbon copy of the suspension notice prepared by the defendant Michael on November 13, 1969. In addition to the reason for the suspension, as quoted above, the notice stated the pupil's name, age, race, grade and address. The form also calls for information concerning any school subject the pupil is failing. The defendant Michael, after consulting her record of grades, caused to be inserted in the form that Miss Cleaves had an incomplete grade in Office Occupation for the last complete six-week grade period. This information was not correct in fact because the teacher had previously determined that the incomplete status had been remedied and later the records were changed to reflect that Miss Cleaves made an A.

During the time that the plaintiff and her daughter were in the office of the defendant McCormick, he had before him the suspension notice but no other information concerning Miss Cleaves' record or conduct. The defendant McCormick read to the plaintiff and her daughter the stated reason for the suspension and asked Miss Cleaves about her "involvement" in the boycott. The defendant McCormick considered that there were two separate grounds for the suspension, first, picketing in front of the school and, second, inciting students not to enter the building, with the second ground being the more serious of the two. He testified there had been active efforts on the part of some persons,

students and otherwise, to coerce students not to enter school during the period of the boycott. Based solely upon the suspension notice and the statements of Miss Cleaves, the defendant McCormick determined, and so advised the plaintiff and her daughter, that Miss Cleaves would not be allowed to return to school. This was an effective expulsion from the school system. During the meeting, the defendant McCormick discussed three possible alternatives for Miss Cleaves. One was attending one of the two night schools of the Memphis system commencing in January, 1970, and continuing in summer school in order to obtain the necessary units for a high school diploma. Another alternative was possibly attending a parochial school which had seen fit to accept other students who had been suspended for boycott activities. The third alternative was having Miss Cleaves live with a relative and attend another school system. At the time the father of Miss Cleaves was living in Detroit, a fact which the defendant McCormick did not know. Presumably this is why the plaintiff and her daughter, knowing of the absence of the father, construed the defendant McCormick's comments in this regard to mean that she should move to Detroit with her estranged father. It should be noted that the suspension notice erroneously indicated that the father of Miss Cleaves lived in Memphis at 940 Joseph Place, the actual place of residence of the plaintiff and her children.

During the meeting there is no evidence to indicate that the plaintiff and Miss Cleaves were told that they were entitled to a hearing or that there was a possibility of other alternatives in the form of attending other schools of the system. As of the end of the meeting, Miss Cleaves was no longer a student in the City of Memphis School System, and she had no known hope of readmission as a regular student.

Thereafter, Miss Cleaves more vigorously participated in the efforts of the Black Coalition with the added purpose of protesting her effective expulsion

from the Memphis City School system which she thought was too severe and unjustly administered. On Sunday, November 16, 1969, she participated in a program broadcast over radio station WDIA, which station has a large Negro audience. A transcript of her remarks over the radio station is Exhibit "A" to the answer of the defendants. The statement is critical of the administrative personnel at Northside and contains portions which are untrue, inaccurate or exaggerated. She resumed picketing on the sidewalk in front of Northside School on November 17, 1969, and continued that practice daily through Friday, November 21, 1969.

On Thursday, November 20, 1969, Miss Cleaves participated as a leader in a march from the vicinity of Northside High School to Humes High. No violence occurred at Humes and the proof indicates that she assisted the school officials in causing the persons who had assembled to disburse. On that occasion Miss Cleaves was invited into the office of J. K. Carr, Assistant Principal of Humes High, for a conference concerning the march on Humes and the disbursement of the group involved. In a statement attached to the Affidavit of the Attorney for the Plaintiff in Support of the Motion for Preliminary Injunction, Mr. Carr summarized the conference in his office as follows:

"Debra indicated to me in the office that all she wanted to do was go to school. She was told that this is a hell of a way to get back in school. She promised to leave the Humes area and would curtail her activities. When she left the building the remaining members of the group went with her."

On Friday, November 21, 1969, disturbances involving bottle and brick throwing occurred at Manassas High School when a group of an unknown number assembled at the school. After the disturbances had subsided, Miss Cleaves and others arrived at Manassas School. The police were still patrolling the area, and while Miss Cleaves was engaged in a conversation with one of the teachers at Manassas High School, a police officer directed her to move and indicated there would be no more picketing at Manassas High School. When she did not move as directed, she was arrested on a charge of disorderly conduct and taken to the Police Headquarters, from which she was released to the Juvenile Court.

On November 25, 1969, and December 1, 1969, requests were made of the defendant McCormick by leaders of the Black Coalition for readmission of Miss Cleaves to Northside High School. On both occasions the requests were denied.

On November 28, 1969, Miss Cleaves and her mother met with the Juvenile Court Probation Officer concerning charges arising from Miss Cleaves' arrest on November 21, 1969, for disorderly conduct. She was informed by the Juvenile Court Probation Officer that her case could be disposed of without the necessity of a hearing and that by handling her case in this manner she would be able to return promptly to school. (Ex. "G" to hearing before Board of Education). She and her mother agreed to this and her case was disposed of non-judicially, in accordance with regulations of the Juvenile Court of the City of Memphis. In the course of the non-judicial disposition, Miss Cleaves signed a form admitting that she committed the offense of disorderly conduct on November 21, 1969. The form also waived a hearing to determine her guilt or innocence. (Ex. "C" to defendants' Answer). At the hearing in this Court Miss Cleaves testified that she did not believe that she was guilty of any criminal offense, but that she signed the form upon the assurances that she would be admitted to school promptly. There is no evidence that the Juvenile Court Probation Officer handling her case had contacted the defendant McCormick or any other Board of Education personnel concerning the nature of the suspension of Miss Cleaves. Not only was the non-judicial disposition of the disorderly conduct charge not an entree to school promptly, but on December 1, 1969, the defendant McCormick, in denying her application for readmis-

sion, asserted as an additional ground, the fact that she had signed a form admitting she was guilty of disorderly conduct.

On or about December 3, 1969, the attorney for Miss Cleaves was advised that Miss Cleaves' suspension had been reviewed and that the Attendance Division had determined that she would not be allowed to return to Northside or other Negro schools where disturbances had occurred but she would be permitted to return to one of two other schools that had the VOE program after the end of the Christmas holidays of the school system, January 5, 1970. Memphis Technical School being closer to the residence of the plaintiff and Miss Cleaves, they accepted that assignment and Miss Cleaves commenced at Tech High School on January 5, 1970. After this change of schools, Miss Cleaves encountered considerable difficulty because of a change of teachers, the use of different text books and the loss of time due to her suspension. The change also created a financial hardship on the plaintiff. The testimony indicates that her former teacher at Northside is willing to assist her in making up hours missed in the VOE program during her suspension, whereas, no similar offer has been made by the VOE teacher at Tech.

At the time, or shortly after the Adjustment Transfer to Tech High School was accepted by the plaintiff and her daughter, their counsel requested a hearing upon the action of the Attendance Division. Since Miss Cleaves commenced attending Tech High School on January 5, 1970, she has diligently pursued her course of instruction. With exceptional effort, she has made good grades and is reported to have a very good attitude at Tech High School. (Affidavits of Mrs. Thelma Cooper and Mrs. Kathryn Rule, included in Affidavits in Opposition to Motion for Preliminary Injunction).

On January 7, 1970, the staff of the Board of Education met with counsel for plaintiff and Miss Cleaves concerning the action of the Attendance Division in granting the Adjustment Transfer. Presumably, no proof was heard but the matter was thoroughly discussed and the staff determined that "the decision of the Attendance Department not be reversed and that Miss Cleaves be given the right to attend either Tech High School or East High School where the courses she sought were available." (Trans. of Hearing, Board of Education, at p. 1.2). Subsequent thereto, a hearing before the Board of Education was requested. This hearing commenced on January 16, 1970. It was not completed on that date and was adjourned to January 23, 1970. On or about January 30, 1970, counsel for the plaintiff was advised that the Board had determined that Miss Cleaves should continue to attend Tech High School, as directed by the Attendance Division. Subsequent thereto, this suit was filed.

A transcript was made of the hearing before the Board and by stipulation that transcript has been filed in the cause. The first volume is the portion of the hearing on January 16, 1970, and is 115 pages in length. The second volume is the portion conducted on January 23, 1970, and is 80 pages in length. The hearing was conducted informally. Miss Cleaves and other witnesses in her behalf testified on the basis of questions propounded by counsel for Miss Cleaves. While the procedure was different in many respects from the conventional judicial proceedings, Miss Cleaves was given the opportunity to fully testify on her activities prior to and during the boycott. The Board did not offer any formal proof; however, from time to time, Mr. Michael, one of the defendants in this cause, did interject his version of certain phases of the incidents. Counsel for the School Board did introduce certain exhibits, namely Exhibit "A", a report, entitled "Information for Mr. Petree," prepared by Quinnie McCormick, and dated December 4, 1969; Exhibit "B", the waiver of right to a court hearing and admission of committing the offense of disorderly conduct signed by Miss Cleaves at the Juvenile Court; Exhibit "C", a "Record of Arrest from the

City of Memphis Police Department". Other exhibits, including statements from various persons, were introduced by counsel for Miss Cleaves.

At the beginning of the hearing, counsel for Miss Cleaves requested "a definite statement of precisely what are the grounds for, number one, Deborah's suspension and, number two, Deborah's Adjustment Transfer to Tech High School." (Trans. Bd. Ed. Proceeding 1.05). Counsel for the School Board responded to this request with a narrative account of various phases of Miss Cleaves' conduct from the period of her home suspension on November 12, 1969, until the guilty plea in Juvenile Court on November 28. From the transcript, the various items appear to be as follows: (1) some of the acts that appear in the arrest record (Ex. "C" to the Trans. Bd. of Ed. Hearing) coupled with Miss Cleaves' guilty plea in Juvenile Court; (2) Miss Cleaves' return to school in violation of the home suspension and (3) during the boycott Miss Cleaves was one of the leaders who encouraged students to remain away from school. Counsel for the School Board summarized the charges as follow:

"So that the relationship between Miss Cleaves and the school absences—which you know went up to as high as sixty-five thousand—is more than passing in nature.

"In sum and substance, I guess you could say that the staff feels that Miss Cleaves was one of the ringleaders in urging and inciting children to remain away from school.

"There are, perhaps, other matters that could be mentioned that led to the decision by the staff—that led to this result.

"I frankly have thought of all I can think of right now."

Trans. Bd. of Ed. Hearing
pp. 1.6, 1.7.

Later, counsel for the Board of Education stated "of course, there is the WDIA matter but I do not think it had much influence on the staff's decision. I shall only refer to that but that is not one of the matters of grave importance as I see it."

Inasmuch as Exhibit "A" to the transcript of the proceedings before the Board entitled "Information for Mr. Petree" might be considered a basis for the action of the Attendance Division or Administrative Staff, it should be considered in the light of the proof developed at the hearing in this Court. It is a chronological account of information pertaining to Miss Cleaves. It is dated December 4, 1969, and was prepared by Mr. McCormick. The entry for November 14, 1969, states as follows:

"11/14 Deborah admits that she picketed the school after getting a home suspension for leaving the campus and cutting classes. Home suspension not answered. She stated that she had attended school on the first 'Black Monday' and that she talked to her teachers, black and white, and was told by some that she should get involved. Deborah is an 'A' student and plans to attend Memphis State. Because of her direct effort to turn fellow students away and based upon the recommendation of the principal, we are denying her the right to return to school. Told that she could go to night school in January and Summer school to complete requirements for graduation by Fall. School notified to drop."

From the testimony in this cause there are items contained in that entry which might be misunderstood. In the first place, the home suspension was answered within the three-day period as indicated on the form. At the time that plaintiff and her daughter responded to the home suspension they were advised that a board suspension had been issued during the period of the home suspension. The term "direct effort" is susceptible of different meanings and might be understood to mean some overt activity. There is nothing in the record to support activity on the part of Miss Cleaves prior to November 14, 1969, which caused students to stay away from school, other than picketing. Furthermore, Mr. McCormick had received no communication

from Mr. Michael, other than the suspension notice by November 14, 1969, and the suspension notice did not recommend that Miss Cleaves be denied the right to return to school. It should be noted that Mr. McCormick testified that at some later date he did receive a recommendation from Mr. Michael that Miss Cleaves not be allowed to return to school. It should also be noted that the later decision to allow her to return to the school system in another school was based in a large measure upon the recommendation of her former principal, Mr. Michael.

Counsel for the plaintiff seek an injunction in this cause primarily upon the theory that Miss Cleaves was in the proper exercise of her First Amendment rights of speech and protest and that her suspension by the defendant McCormick was in violation of her Fourteenth Amendment due process rights. Plaintiff contends that the deprivation of her constitutional rights of due process so tainted the handling of her suspension and subsequent adjustment transfer that the Court should issue a mandatory injunction ordering the defendants to reassign her to Northside High School. Plaintiff also contends that the subsequent handling of the suspension and adjustment transfer by the Administrative Staff and the Board itself, was in violation of Miss Cleaves' constitutional rights of due process and equal protection of the laws.

■ First, it is necessary to determine the rightful duties of the Board of Education and its administrative personnel to undertake to discipline Miss Cleaves for her conduct in the light of the First Amendment to the Constitution. The First Amendment rights of students are not unlimited. They must be exercised without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others. Tinker v. Des Moines School District, 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Burnside v. Byars, 363 F.2d 744, 749 (C.A. 5 1966).

"[C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Tinker v. Des Moines, *supra* 393 U.S. at p. 513, 89 S.Ct. at 740.

"It is always within the province of the school authorities to provide by regulation the prohibition and punishment of acts calculated to undermine the school routine. This is not only proper in our opinion but is necessary." Blackwell v. Issaquena County Board of Education, 363 F.2d 749, 753 (C.A. 5 1966).

■ It is the opinion of this Court that the defendant McCormick and other administrative personnel of the Board of Education were charged with the duty of offering public education to the students of the City of Memphis and that this education could not be adequately offered unless the students were in school and relieved from disruptive interferences. While this Court does not find that any and all absences from school in furtherance of a racial protest require disciplinary action, regular and repeated absences which cause interference with the educational processes must not go unchecked. It is the opinion of this Court that the defendant Michael was justified in issuing the Home Suspension for the reasons set forth therein. It is further the opinion of this Court that the defendant Michael was justified in issuing the Board suspension in the circumstances. This is not to say that Miss Cleaves should have been given an indefinite suspension automatically by virtue of her conduct prior to the issuance of the Board Suspension. She should have expected to suffer appropriate disciplinary action as the result of her exercising her First Amendment rights in the manner chosen by her but she was entitled to

have the discipline given in an appropriate manner.

In matters of student discipline in public schools, the Constitution requires that the act be consonant with due process of law. State ex rel Arakian v. Hyman, 180 Tenn. 99, 171 S.W.2d 822 (1942). Minimum procedural requirements necessary to satisfy due process depend upon the circumstances and the interests of the parties involved. Dixon v. Alabama State Board of Education, 294 F.2d 150 (C.A. 5 1961). Any action that effectively denies an education to a student must meet the minimum standards of due process. Madera v. Board of Education of New York, 386 F.2d 778, 784 (C.A.2 1967). An indefinite suspension is deemed the equivalent of an expulsion. Madera v. Board of Education of City of New York, *supra,* at p. 784, f.n.6.

In the instant case the Court is of the opinion that the procedure followed in the disposition of the board suspension did not meet the minimum standards of due process as guaranteed to Miss Cleaves under the Fourteenth Amendment of the United States Constitution. During the meeting in the office of the defendant McCormick, Miss Cleaves was effectively expelled from the Memphis City School System. She was a 12th grade student who was indefinitely suspended. While it is true that her prior conduct justified a charge warranting appropriate discipline, this discipline should not have been issued without further information in the hands of the official charged with determining what discipline should be given. The record reflects no previously announced regulations which prescribed a procedure for the Coordinator of the Department of Pupil Services to follow in ruling upon the appropriate discipline in such circumstances. Under the procedure that was followed, the principal of Northside High School furnished no information other than that set forth in the suspension notice. There was no narrative account describing the conduct which prompted it other than "picketing in front of the school and inciting students not to enter the building." The term "inciting" is capable of many meanings and the defendant McCormick testified that there had been incidents of active coercion or persuasion in support of non-attendance at school; however, there is nothing in the record to indicate that Miss Cleaves had done more than picket on the morning of November 13, 1969, the day the board suspension had been issued. The Court concludes that the defendant McCormick issued the indefinite suspension upon the assumption that Miss Cleaves had picketed and actively incited students not to enter the building. While it is true that Miss Cleaves and her mother were read the charges by the defendant McCormick, there is no indication that the nature thereof was explained to them and understood by them before the imposition of the severe punishment. Furthermore, the previous good record and industrious attitude of Miss Cleaves was not before the Coordinator at the time of the meeting. There is no indication that the method employed, contemplated a review of the decision as a matter of right, nor was the student advised of any means whereby a more complete investigation or hearing would be allowed. In this regard, the defendant McCormick testified that if Miss Cleaves had denied the charges as read to her that he would have taken the matter under advisement and investigated it.

From and after the indefinite suspension on November 14, 1969, and until approximately December 3, 1969, Miss Cleaves was not a student in the Memphis City School System and, therefore, her conduct, particularly in the area of First Amendment rights, should be judged differently than if she were fully subject to discipline by the school authorities at that time. Her remarks on the WDIA broadcast were critical of school officials in the handling of her suspension. However, it must be remembered that these remarks were made during a period of strong protest which caused as many as sixty-five thousand (65,000) pupils to be absent from the schools; furthermore,

the remarks were made two days after her indefinite suspension, imposed during a meeting which this Court has found did not meet the minimum standards of due process. Other significant factors taken into consideration in the ultimate disposition of her case center around the march on Humes High School on November 20, 1969, and her arrest and conviction subsequent thereto arising from her presence at Manassas High School on Friday, November 21, 1969. With regard to the Humes High incident, it must be remembered that Miss Cleaves' leadership role arose from the belief that she was an unjust victim of the School Board authorities and also that she assisted school officials at Humes in the disbursement of the group assembled. With regard to the Manassas School incident, she was arrested for not following the directions of the police officer who was undertaking to maintain order after a serious outbreak of violence at the same location a short time before. The arrest records indicate that the police officer was partially motivated "because the officers feel that she was one of the leaders of the disorderly group." There is no proof to support that she was in the disorderly group. She arrived at the site after the disturbance was quelled. The record also reflects that she was persuaded to sign the admission of guilt in order to obtain a nonjudicial disposition of her case and thereby be returned to school promptly. This was obviously a misunderstanding inasmuch as the School Board officials later used that admission of guilt as an additional ground for her punishment.

 With regard to the hearing before the governing board of an educational institution, the hearing need not be a full-dress judicial hearing with the right to cross-examine witnesses. The student should be given the names of the witnesses against him and should be given an opportunity to present to the Board his own defense against the charges on oral testimony or written affidavits of witnesses in his behalf. Dixon v. Alabama State Board of Education, *supra*. Being advised of the charges for the first time upon appearing before the committee is not a violation of procedural due process. Jones v. State Board of Education, 279 F. Supp. 190 (M.D. Tenn. 1968). Upon consideration of the contents of the transcript of the hearing before the Board of Education, this Court finds that it met the minimum procedural requirements for a hearing whereby a student seeks a reversal of a disciplinary ruling. In this regard, the Court observes that the time of both the Board and all parties concerned with the hearing would have been conserved had a more specific list of grievances been furnished Miss Cleaves and her attorney in advance of the hearing. However, as indicated above, the minimum requirements of due process were met by the hearing.

In this cause counsel for the defendants relies upon Madera v. Board of Education of City of New York, *supra*, for the proposition that this Court should not interfere with the administrative ruling of the Attendance Department and the subsequent agreement with that ruling by the staff and Board itself, because Miss Cleaves was reinstated with an adjustment transfer to a different school. In the *Madera* case the Court of Appeals ordered an injunction issued by the District Court vacated wherein the District Court had enjoined the officials of the school system from conducting a Superintendent's Guidance Conference unless the student's attorney was allowed to participate in the hearing. While it is true that the Superintendent's Conference was held after a suspension issued by the principal of the school and in that respect was similar to a Board Suspension in the instant case, there are distinguishing circumstances in that case from the instant case. The conference referred to in the *Madera* case is controlled by specific regulations set forth in a general circular which requires notice when and where the conference will be held. In attendance at the conference there is the student, his parents, the principal, the guidance counselor of the child's school, the District Superintendent, his assistant, the guidance counselor assigned to

her office and a School-Court Coordinator assigned to the district. At the beginning of the conference it is made clear that the conference is not punitive but is an effort to solve the student's problems. Notes are taken and records are kept of the conference. The authority of the conference is limited to reinstating the child in the same school, transferring him to another regular school, or transferring him to a special school. There is no indefinite suspension authority. In holding that the parents and student were not entitled to the presence of an attorney as a matter of right, the Court recognized that the conference was a preliminary conference and not an adjudication.

■ Counsel for the plaintiff in the instant case assert violation of equal protection rights of Miss Cleaves, primarily, on the grounds that other students who participated in the boycott were readmitted to the same schools. In this regard, the proof reflects that some pupils were suspended and not readmitted to any school; that nine are in the same category that Miss Cleaves is in, namely, adjustment transfers were granted; and that some were readmitted to the schools from which they were suspended. Presumably, all mere truancy suspensions were revoked. This Court concludes that there is no showing of deprivation of Miss Cleaves' constitutional rights to equal protection of the law because each case must be evaluated in the light of the student's actual conduct.

■ The appropriate disposition of this case is difficult in view of the Court's findings and conclusions previously set forth herein. This Court has the benefit of a full evidentiary hearing wherein the conduct of all parties in the litigation was placed under close scrutiny. The version of facts which the Court received was offered after the tension of the crisis had subsided. The Court is of the opinion that Miss Cleaves was a victim of a boycott and movement which caused considerable injury to many persons. Feelings were tense and actions were taken which otherwise would not have been taken. While this Court does not believe that its role is merely to review the disciplinary action of the Board of Education with regard to its students, the Court does believe that its proper function is to protect the constitutional rights of the citizens. Even though the school authorities were justified in disciplining Miss Cleaves for her conduct, this discipline should have been dispensed at all stages in accordance with due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. Upon consideration of all of the circumstances, the Court is of the opinion that Miss Cleaves should be returned to Northside School. The Court wishes to observe that it does not condone the disruptive conduct of students and others which occurred during the boycott, nor does it condemn the school officials in their efforts to preserve order in the school system.

Much of the proof in the Board hearing and in this hearing addressed itself to the effect of Miss Cleaves' return to Northside School from the standpoint of the reaction it would promote. Opinions were expressed by some teachers and others that her return would improve the discipline in the school because students believe that she was treated unjustly. On the other hand, other teachers vehemently oppose her return because it might undermine authority of the Board of Education and all other officials. These extremely opposed views are indicative of the polarization of many of the citizens of this community on the issues and methods followed in the boycott and its ultimate settlement. These controversies are regrettable; however, this Court cannot shirk its responsibility when constitutional issues are raised in a proceeding in this court. If, after the return of Miss Cleaves to Northside, she is a participant in conduct which authorizes disciplinary action, school officials may by proper methods undertake to impose proper punishment. In doing so, all of

Miss Cleaves' prior activities may be taken into consideration.

Counsel for the plaintiff will prepare an appropriate injunction in accordance with this opinion.